# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### October 4, 2005 Session

## STATE OF TENNESSEE v. TROY WAYNE STEPP

**Direct Appeal from the Circuit Court for Tipton County**
**No. 4949      Joseph H. Walker, III, Judge**

---

**No. W2005-00589-CCA-R3-CD  - Filed January 3, 2006**

---

The defendant, Troy Wayne Stepp, was convicted of delivery of a Schedule II controlled substance, methamphetamine, a Class C felony, and sentenced as a multiple offender to eight years in the Department of Correction.  On appeal, he argues:  (1) the trial court erred in allowing the introduction of a transcript of a taped-recorded conversation; and (2) the evidence was insufficient to support his conviction.  Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JERRY L. SMITH and THOMAS T. WOODALL, JJ., joined.

David S. Stockton, Assistant Public Defender, for the appellant, Troy Wayne Stepp.

Paul G. Summers, Attorney General and Reporter; David H. Findley, Assistant Attorney General; Elizabeth T. Rice, District Attorney General; and James Walter Freeland, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

### State's Proof

On July 6, 2004, the defendant was indicted by the Tipton County Grand Jury for delivery of a Schedule II controlled substance, methamphetamine.  This indictment was the direct result of a January 6, 2004, controlled drug transaction with a confidential informant who was working

undercover with law enforcement officials. Katrina Douglas[1] testified that she and her husband, Jeremy Douglas,[2] worked as confidential informants for Agent Mike Rose of the Tipton County Sheriff's Department Drug Task Force.[3] Katrina said that she and her husband met with Agent Rose in his office after she overheard Jeremy on his cell phone make arrangements to buy drugs from someone. Agent Rose searched the Douglases and their van, then put a body wire on Jeremy, gave him a one-hundred-dollar bill, and told the couple where to go. Katrina explained that her role in this controlled drug buy was to be the driver because her husband did not have a license. Katrina said she drove them to the Penny Pantry in Atoka where she got out and walked across the street, leaving Jeremy with the van. About twenty to thirty minutes later, Jeremy drove over to pick up Katrina, and she noticed the van had a "chemical smell, really strong smell" which she described as "overwhelming." Jeremy then showed her "a small plastic bag" containing "an off-white color" substance. Katrina then drove herself and Jeremy back to Agent Rose's office, where Jeremy gave Rose the plastic bag and the couple were again searched. Katrina denied being paid for participating in the drug buy and said she did not know if Jeremy was paid. Katrina acknowledged that Jeremy had a drug problem with "crystal meth."

On cross-examination, Katrina said that she and Jeremy were currently divorced and were not living together the day of the drug transaction. Asked about her search, Katrina said Agent Rose and another male officer had her empty out her pockets, "grab the middle of [her] bra and lift and shake while holding [her] shirt out," take off her shoes, and shake her pants leg. She said the officers did not use a drug task force dog to search her, her husband, or their van. The officers also searched her van for about "[f]ifteen, thirty minutes." Asked about Jeremy's search, Katrina said the officers had him remove his shirt and then "[t]hey patted him down, checked all of his pockets, pulled up his pants leg and checked his socks and shoes. And he had to take out his wallet. They went through his wallet, too."

Agent Michael Rose testified that the Douglases signed up as confidential informants the day before the controlled drug buy after Jeremy contacted him with some information. Rose said they planned "to purchase a gram of crystal meth." Prior to the buy, Rose and his partner searched the Douglases in his office. Regarding Katrina's search, the agent said that there was no female officer present and no intrusive cavity search was conducted. Instead, as was done with most females, Rose explained that:

> [Katrina] had on a baggy shirt, if I remember. And we pat their pockets down. Make
> them take everything out of their pockets, take their shoes off. And we ask her to just

---

[1]Due to the witness and her husband sharing last names, we will utilize their first names in referring to them. We intend no disrespect by this procedure but do so to avoid continually repeating the full names of the witnesses.

[2]At the time of the trial, the Douglases were divorced and Jeremy's whereabouts were unknown. Consequently, Jeremy did not testify at trial.

[3]Although she first denied ever working for the drug task force, Katrina later acknowledged signing a confidential source agreement with the task force.

grab her bra strap in the middle and pull it out and pop it two or three times. That's just so nothing can be hid, you know. There's no way.

As for Jeremy, the officers "searched him, [they] patted him down, took his shoes off, socks off, everything." The officers also searched the Douglases' van by checking all the places where drugs could be hidden, such as the "ashtrays, the doors, underneath the seats, [and] the panels."

Rose said after searching the couple and their van, he put a Kel set, which is "a two-part listening device," on Jeremy, which enabled the officers to hear and record the transaction through a receiver in their car. Rose gave Jeremy a one-hundred-dollar bill and told the Douglases to park their van at the Penny Pantry. After parking the van, Katrina walked across the street while Jeremy raised the van's hood so that passersby would think he was working on the van. The agent then watched the defendant walk up to the van, talk to Jeremy, and lean inside the van through the passenger door. After the defendant left, Jeremy drove across the street to pick up Katrina, who then drove them back to Agent Rose's office. Rose said he had visual contact on the Douglases the entire time. Once at the office, Jeremy gave Rose a "plastic baggy with some off-white, round-type substance" that had a very strong odor and field-tested positive for methamphetamine. Rose said he again searched the Douglases and their van and did not find the $100 he had given Jeremy earlier.

Rose filmed the entire encounter on a hand-held eight-millimeter camera, which he later converted to VHS format. Rose explained that a transcriptionist then transcribed the tape, which he believed was an accurate reflection of the drug transaction. The videotape and transcript were both entered into evidence and given to the jury. After the tape was played for the jury, Rose testified that he believed he heard the defendant say, "I just got through washing" and explained that "washing" is the final stage of producing crystal methamphetamine.

Agent Rose testified that he was familiar with the manufacture of methamphetamine and explained that anhydrous ammonia, a main component of the drug, is a liquid fertilizer with a smell that "will take your breath away." He further elaborated that the smell "would be equivalent to probably 20 or 30 times household cleaning ammonia, with kind of a chemical odor to it" and that being around methamphetamine while it is being manufactured would "absolutely" make a person smell.

On cross-examination, Agent Rose acknowledged that although he believed he heard the defendant on the videotape say "I just got done washing it," neither he nor the transcriptionist heard it earlier and it was not, in fact, part of the transcript. Asked about Jeremy, Rose said he had met him several times before but only signed him up as a confidential informant the day before the drug transaction with the defendant. Asked if Jeremy was paid for his participation, Rose said that his books were being audited and he could not remember if the informant had been paid. Asked about the searches conducted on the Douglases, Rose said neither he nor his partner actually patted Katrina down, instead they "just had her turn her pockets out" and remove her socks and shoes. Rose also acknowledged the search of Jeremy was a "cursory pat-down" but reiterated that he had "never had [an informant] bring dope to a drug deal, . . . [t]here's too big a chance of getting caught." Asked

about the recorded transaction, Rose explained he started to record from the moment the defendant pulled up and started to walk toward the informants' van. Rose did not record the drive back to his office because "there was no need to."

Agent Rose acknowledged that Jeremy was not present in court, that he had not talked to him in several months, and that he did not know Jeremy's whereabouts. Rose said he was aware that the informant had a drug problem and that he was in fact "using meth." The day of the drug transaction, Jeremy denied being under the influence of any drugs and Rose did not think he appeared to be either. Rose said the bag containing the methamphetamine was not checked for fingerprints because "[i]t's almost impossible to lift the prints off of [a plastic bag containing the drug] because of the chemicals that are in crystal meth."

Erica Katherine, a forensic psychiatrist with the Tennessee Bureau of Investigation Crime Laboratory, testified that her analysis of the contents of the plastic bag that the informant received from the defendant "revealed that the contents contained methamphetamine, which is a Schedule II, at 0.8 grams." On cross-examination, Katherine said she had no knowledge of whether methamphetamine can "leak through plastic and destroy fingerprints."

**Defense Proof**

Mark Thomas, Jeremy Douglas' roommate, testified that he took Jeremy to meet Katrina on January 6, 2004, and that Jeremy returned home that evening with a tool set he got from the defendant. Thomas said he and Jeremy used the tools to change the spark plugs in Katrina's van. Thomas recalled seeing Jeremy with methamphetamines as they left to go meet Katrina. Thomas acknowledged that he had previously been "busted with possession of crystal meth" but stated that he no longer used drugs.

Patricia Bogenschneider, the defendant's girlfriend, recalled going with the defendant to meet Jeremy at the Penny Pantry on January 6, 2004. She said Jeremy called them and said that his van was disabled and asked the defendant to come look at it. Bogenschneider testified that the defendant brought Jeremy some tools but denied seeing the defendant with any plastic bags or drugs.

The defendant testified that he met Jeremy at the Penny Pantry on January 6, 2004, because Jeremy needed to borrow some tools to fix his van. The defendant denied that he had heard of the term "wash" but said he had washed his car that day. He said that he and Jeremy had "talked about experimenting making crystal meth" but "never got around to doing it." The defendant acknowledged smoking a "joint" before he met Jeremy and having "had a few joints in [his] pocket." He denied delivering or selling any drugs to Jeremy.

On cross-examination, the defendant acknowledged that "[a]nhydrous is used to cook crystal meth" and that it has a very distinctive smell that "will knock you out." Although he did not recall saying, "I need some anhydrous" to Jeremy, he acknowledged he may have said it. He also

-4-

acknowledged telling Jeremy that he had a "pocketful of dope" but said he meant marijuana, not methamphetamine.

## ANALYSIS

### I. Introduction of Transcript

The defendant argues that the transcript made of the controlled drug transaction should not have been entered into evidence because it violated Tennessee Rule of Evidence 602, the confrontation clause, and the best evidence rule. The State argues because "the defendant never raised a Confrontation Clause objection in the trial court, nor raised any of these claims at all in his motion for a new trial, he has waived the claims." We agree with the State.

At trial, the following transcription of the controlled drug transaction was entered into evidence:

CS 0025:[4] Are you in a hurry[?]

[The defendant]: Yeah, I don't like it up here.

CS [0025]: Oh I hear you there. Look, I want to talk to you about this and, is it hitting?

[The defendant]: Yeah.

CS 0025: Okay. You stink man, you smell like that shit bad.

[The defendant]: Do I?

CS 0025: Hell yeah, hell. Hey don't talk about in front of Mark or nothing but if you need someone to cook that shit, let me know cause I got.

[The defendant]: If I what?

CS 0025: Anywhere to cook that shit, let me know cause I got.

[The defendant]: I might just need that man.

CS 0025: Uh.

[The defendant]: I might need that in a couple of days.

---

[4]CS 0025 is Jeremy Douglas.

CS 0025: All right well uh.

[The defendant]: I need some anhydrous[.]

CS 0025: You do what.

[The defendant]: I'll go with you, I need some anhydrous.

CS 0025: All right[,] well uh.

[The defendant]: I'm gonna go[,] I've got a pocket full of dope buddy, I'm sorry, but hey I'll be at Mark's in about an hour or two.

CS 0025: All right, he's spooked.

[The defendant]: _____[.]

CS 0025: I'll give it back to you. He's spooked like a son-of-bitch.

Upon the State's motion to enter the transcript into evidence, defense counsel made the following objection:

> Your Honor, we object to the introduction of his version of what was happening. Again, the best evidence would be what was the tape. We don't have the transcriptionist here, and certainly there are dashes and things in there that apparently may reflect interpretation of what was said. And we submit that simply the best evidence would be looking at the tape. It's here. The volume can be turned up. And although it would help maybe the State's case to be able to argue in closing argument, "Here is the transcription; this is what we say you heard," that, as far as the evidence, comprises hearsay and is not the best evidence of what happened. If you ask for an ultimate conclusion, that's the province of the jury as to what was said on that tape, rather than the interpretation by the officer. We object to the introduction of his version of the statement itself, and say the jury should simply listen to the tape, hear it, and value it for what it's worth.

As the State points out, the defendant did not object to the introduction of the transcript based on the Confrontation Clause.[5] In addition, in his motion for a new trial, the defendant only challenged the sufficiency of the evidence and did not challenge the introduction of the transcript. Accordingly, we agree with the State that the defendant has waived consideration of this issue on appeal. See Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be

---

[5]Although the defense objected that the transcriptionist was not there, we read the thrust of the objection as being a Best Evidence Rule.

granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error."); Tenn. R. App. P. 3(e) (providing that "no issue . . . shall be predicated upon error in the admission or exclusion of evidence, jury instructions granted or refused, misconduct of jurors, parties or counsel, or other action committed or occurring during the trial of the case, or other ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial").

In addition, even accepting, *arguendo*, that the transcript should not have been admitted, we find the admittance to constitute harmless error. After admitting the transcript into evidence, the trial court gave the jury the following limited instructions:

> Ladies and gentlemen of the jury, as indicated, this is for you, to help you determine what is said. But if you determine something is said on the tape that's different than the typed version, then you're to go by what you interpret as being said on the videotape. If you find it not helpful to you, you don't have to use it. If you find it helpful to you, you can look at it, either way.

In light of this jury instruction to rely on the videotape and not the transcript to determine what was said, we find this issue to be without merit.

## II. Sufficiency of the Evidence

The defendant argues that the evidence presented at trial was insufficient to convict him because it essentially amounted to circumstantial evidence that failed to logically imply a criminal act occurred. He elaborates that "[o]nly through conjecture and speculation could the jurors find anything to support a finding that the [defendant] ever had the controlled substance . . . in his possession." The State argues the evidence was sufficient to support the conviction. We agree with the State.

When the sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L .Ed. 2d 560, 573 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

Circumstantial evidence alone may be sufficient to support a conviction in Tennessee. State v. Tharpe, 726 S.W.2d 896, 899-900 (Tenn. 1987); State v. Jones, 901 S.W.2d 393, 396 (Tenn. Crim. App. 1995). If based entirely on circumstantial evidence, however, the evidence "'must be not only consistent with the guilt of the accused but it must also be inconsistent with his innocence and must exclude every other reasonable theory or hypothesis except that of guilt.'" Tharpe, 726

S.W.2d at 900 (quoting Pruitt v. State, 460 S.W.2d 385, 390 (Tenn. Crim. App. 1970)). The standard for appellate review is the same whether the conviction is based on direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

To obtain a conviction for delivery of a Schedule II controlled substance, methamphetamine, the State was required to show beyond a reasonable doubt that the defendant knowingly delivered methamphetamine to the informant. See Tenn. Code Ann. § 39-17-417(a)(2) (Supp. 2005). "Deliver" or "delivery" is defined as "the actual, constructive, or attempted transfer from one person to another of a controlled substance, whether or not there is an agency relationship." Id. § 39-17-402(6) (Supp. 2005).

Viewed in the light most favorable to the State, the evidence was sufficient to support the defendant's conviction for delivery of methamphetamine. The proof at trial established that undercover drug task officers arranged for confidential informants to make a controlled methamphetamine purchase from the defendant. The officers searched the informants and their van prior to the drug buy and did not find any type of illegal drugs. During the drug transaction, which was recorded, the defendant discussed making "crystal meth" with the informant. The defendant also acknowledged telling the informant he had a "pocketful of dope." One informant, Katrina Douglas, testified that after the transaction was completed, the other informant, Jeremy Douglas, showed her a plastic bag containing an "off-white color" substance and said that her van had a very strong chemical odor that was not there prior to the drug buy. After the transaction, Jeremy Douglas gave the drug task force officers the plastic bag which contained .8 grams of methamphetamine. The officers searched the informants and their van once again and found no traces of drugs or the $100 that was used to buy the drug. Under these circumstances, a rational jury could have concluded that the defendant delivered the methamphetamine to the informant. We conclude, therefore, that the evidence presented in this case was sufficient to sustain the defendant's conviction.

The defendant argues, among other things, that the evidence failed to show that the informants did not have methamphetamine on their persons prior to meeting with the defendant. He argues Agent Rose failed to conduct a "meaningful" search of the informants or their van, either before or after the drug transaction, and that the evidence, at most, shows only that Jeremy Douglas was a methamphetamine addict who had the drug on him prior to meeting with the drug task force. Although there was conflicting testimony in this case, "[q]uestions concerning the credibility of

witnesses, the weight and value of the evidence, as well as all factual disputes raised by the evidence, are for the trier of fact; appellate courts do not reweigh the evidence or reevaluate credibility determinations." State v. Flake, 88 S.W.3d 540, 554 (Tenn. 2002) (citing State v. Holder, 15 S.W.3d 905, 912 (Tenn. Crim. App. 1999)).  The jury obviously gave more weight to Katrina Douglas' and Agent Rose's testimony, stating that Jeremy Douglas did not have drugs on him prior to the drug transaction with the defendant, than it did to Mark Thomas' testimony that Jeremy Douglas did in fact have methamphetamine on him that day.  This was within the jury's right to do so and this court cannot second-guess these findings.  Accordingly, this argument is without merit.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE